IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-546

Filed 7 May 2024

Durham County, No. 18 CVS 3093

MICHAEL C. HOAGLIN, M.D., Plaintiff,

v.

DUKE UNIVERSITY HEALTH SYSTEM,
INC. d/b/a DUKE UNIVERSITY HOSPITAL
and JOSHUA SETH BRODER, M.D., Defendants.

Appeal by Plaintiff from order entered 27 October 2022 by Judge Michael J.

O'Foghludha in Durham County Superior Court. Heard in the Court of Appeals 28

November 2023.

> *Bailey & Dixon, LLP, by J. Heydt Philbeck, Sr., BrennerBondourant, by*
> *Lawrence H. Brenner, & Brown, Goldstein & Levy, LLP, by Gregory P. Care,*
> *admitted pro hac vice, & Anthony May, admitted pro hac vice, for Plaintiff-*
> *Appellant.*
>
> *Ogletree, Deakins, Nash, Smoak & Stewart, P.C., by Robert A. Sar, Jefferson*
> *Palmer Whisenant, Savannah Singletary, & Vanessa Nicole Garrido, for*
> *Defendant-Appellee.*

CARPENTER, Judge.

Michael C. Hoaglin, M.D. ("Plaintiff") appeals from the trial court's grant of

summary judgment to Duke University Health System, Inc., ("Duke") and Joshua

Seth Broder, M.D. (collectively, "Defendants"). On appeal, Plaintiff argues the trial

court erred by: (1) granting Defendants summary judgment; and (2) denying his

request for attorneys' fees concerning his successful motion to compel. After careful

review, we affirm in part and reverse in part.

## I.    Factual & Procedural Background

This case concerns a hospital's decision to terminate a resident from the hospital's emergency-medicine residency program, an educational program for medical doctors.  Defendant Duke is the hospital, and Plaintiff is the terminated resident.  On 3 July 2018, Plaintiff sued Defendants for breach of contract and violations of the Americans with Disabilities Act (the "ADA").

On 16 November 2020, Plaintiff moved to compel Defendants to produce documents for which Defendants claimed privilege.  On 31 March 2021, the trial court granted Plaintiff's motion.  On 26 August 2021, Plaintiff filed a motion for sanctions and attorneys' fees concerning discovery.  After conducting an in-camera review of the documents for which Defendants claimed privilege, the trial court denied Plaintiff's request for attorneys' fees.

On 30 June 2022, both parties moved for summary judgment.  The evidence presented at the summary-judgment hearing tended to show the following.  In April 2016, Plaintiff signed a contract outlining the terms of his employment with Duke (the "Contract").  Among other things, the Contract states that Plaintiff's sole source of compensation must be the program stipend, and not from other unapproved work: "this shall be the Trainee's sole source of compensation."  The Contract also states that:

> During the term of this Agreement, the Trainee's

appointment is conditional upon satisfactory performance of all Program elements by the Trainee. If the actions, conduct, or performance, professional, academic, or otherwise, of the Trainee are deemed by the Hospital, Office of Graduate Medical Education or Program Director to be inconsistent with the terms of this Agreement, the Hospital's standards of patient care, patient welfare, or the objectives of the Hospital or Program educational expectations, or if such actions, conduct, or performance reflects adversely on the Program or Hospital or disrupts operations at the Program or Hospital, corrective action may be taken by the Hospital, Director of Graduate Medical Education and/or Program Director as set forth in the Corrective Action and Hearing Procedures for Associate Medical Staff (a copy of which is available online at www.gme.duke.edu).

The parenthetical following the Corrective Action and Hearing Procedures for Associate Medical Staff (the "Procedures") includes a hyperlink to the Procedures. The Procedures include various protocols concerning notices, hearings, and appeals within Duke's corrective-action process.

By January of 2017, Defendants received several grievances concerning Plaintiff, including the following: "[Plaintiff] did not listen to concerns, was rude, and discharged a patient too soon"; Plaintiff made perceived racist comments concerning hairstyle; Plaintiff asked a patient questions deemed too personal; Plaintiff performed a pelvic exam that a patient described as an "absolutely unacceptable" experience; and Plaintiff exhibited "unprofessional behavior."

Plaintiff, however, points to several instances in which Defendants spoke highly of Plaintiff's performance, including: "[Plaintiff] is doing very well"; "[Plaintiff]

has all of the skills he will ultimately need"; and Plaintiff is on track to "graduate the program." Duke employees made these last two statements thirty-one days and sixteen days, respectively, before Plaintiff's termination.

In February 2017, Plaintiff saw a counselor at Duke for depression. On 1 March 2017, Plaintiff completed Duke's Reasonable Accommodation Request Form concerning his depression. After receiving Plaintiff's request, Defendants agreed to "ensure that this need is observed." Specifically, Defendants committed to Plaintiff that he would not be "scheduled for more than 5 days in a row." Plaintiff does not allege that Defendants failed to meet this assurance.

On 22 March 2017, Defendants documented additional concerns about Plaintiff's behavior, including: Plaintiff having a "second job driving for Uber"; Plaintiff sleeping in hospital call rooms while "rent[ing] his apartment out on AirBnB"; and Plaintiff "rent[ing] his car out online" and using the hospital fatigue cab for regular transportation. When asked about his alleged other incomes, Plaintiff responded, "[n]o, this is all I do. It's not like I have a secret job or something."

On 30 March 2017, Defendants terminated Plaintiff's employment because of "institutional policy violations." Plaintiff appealed his termination to a hearing panel, and on 1 May 2017, the panel unanimously voted to uphold the termination. On 23 May 2017, Defendants notified Plaintiff of the final determination. Plaintiff and Defendants offer competing evidence as to whether Defendants complied with the Procedures when they terminated Plaintiff.

On 27 October 2022, the trial court granted Defendants summary judgment, dismissing Plaintiff's claims. On 23 November 2022, Plaintiff filed written notice of appeal.

## II.    Jurisdiction

This Court has jurisdiction under N.C. Gen. Stat. § 7A-27(b)(1) (2023).

## III.    Issues

The issues on appeal are whether the trial court erred by: (1) granting Defendants summary judgment; and (2) denying Plaintiff's request for attorneys' fees concerning his successful motion to compel.

## IV.    Analysis

### A.  Summary Judgment

We review appeals from summary judgment de novo. *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008). Under a de novo review, "'the court considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Williams*, 362 N.C. 628, 632–33, 669 S.E.2d 290, 294 (2008) (quoting *In re Greens of Pine Glen, Ltd. P'ship*, 356 N.C. 642, 647, 576 S.E.2d 316, 319 (2003)).

Summary judgment is appropriate when "there is no genuine issue as to any material fact," and a party is "entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2023). Concerning summary judgment, courts "must view the presented evidence in a light most favorable to the nonmoving party." *Dalton v.*

*Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). "Since this rule provides a somewhat drastic remedy, it must be used with due regard to its purposes and a cautious observance of its requirements in order that no person shall be deprived of a trial on a genuine disputed factual issue." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534, 180 S.E.2d 823, 830 (1971).

Indeed, receiving summary judgment has the same effect as winning at trial—without going to trial. *See id.* at 533, 180 S.E.2d at 829 ("The purpose of summary judgment can be summarized as being a device to bring litigation to an early decision on the merits without the delay and expense of a trial where it can be readily demonstrated that no material facts are in issue.").

### 1. Breach of Contract Claims

In his first argument, Plaintiff asserts that the trial court erred by granting Defendants summary judgment concerning his breach-of-contract claims. To support this, Plaintiff argues that (1) the Contract incorporated the Procedures, and (2) he presented evidence that Defendants breached the Procedures. After careful review, we agree with Plaintiff.

### a. Incorporation

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citing *Jackson v. Cal. Hardwood Co.,* 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995)). Contract "construction is a question of law for

the court." *Story v. Stokes*, 178 N.C. 409, 411, 100 S.E. 689, 690 (1919). Incorporation, the idea that a document referenced in a contract can become part of the contract, *see Incorporation by Reference*, BLACK'S LAW DICTIONARY (11th ed. 2019), is a question of construction and thus, a question of law, *see Walker v. Westinghouse Elec. Corp.*, 77 N.C. App. 253, 259, 335 S.E.2d 79, 83–84 (1985).

We considered contract incorporation in *Walker*, where an employee received a "handbook" from his employer. 77 N.C. App. at 259, 335 S.E.2d at 84. The handbook "apparently promised" that it would "become more than a handbook . . . it w[ould] become an understanding . . . ." *Id.* at 260, 335 S.E.2d at 84 (quoting the handbook). The *Walker* Court was "aware that a growing number of jurisdictions recognize that employee manuals purporting to set forth causes for termination may become part of the employment contract even in the absence of an express agreement." *Id.* at 259, 335 S.E.2d at 83.

Nonetheless, we stated that "the law of North Carolina is clear that unilaterally promulgated employment manuals or policies do not become part of the employment contract unless expressly included in it." *Id.* at 259, 335 S.E.2d at 83–84. Therefore, the "contract did not, under our law, include the Handbook." *Id.* at 260, 335 S.E.2d at 84.

We again considered contract incorporation in *Supplee v. Miller-Motte Business College, Inc.* 239 N.C. App. 208, 211, 768 S.E.2d 582, 587 (2015). There, the plaintiff signed a program-enrollment agreement that was "subject to all terms and

conditions set forth in the Catalog." *Id.* at 211, 768 S.E.2d at 587. We held that the enrollment agreement "incorporated the terms and conditions set forth in the . . . student catalog," which therefore "became a part of the contract between defendants and [the plaintiff]." *Id.* at 219–20, 768 S.E.2d at 592.

Here, the Contract states that "corrective action may be taken . . . as set forth in the [Procedures.]" Because the "conditions set forth in the Catalog" were incorporated into the *Supplee* contract, *see id.* at 219–20, 768 S.E.2d at 592, likewise, the requirements "set forth in the [Procedures]" were incorporated into the Contract.

The Contract could have incorporated the Procedures with more force: For example, the Contract could have stated that "the procedures are incorporated into this contract," or "the procedures are part of this contract." Nonetheless, the Contract incorporated the Procedures because under *Supplee*, the Procedures were "expressly included" in the Contract. *See id.* at 219–20, 768 S.E.2d at 592. Accordingly, concerning Plaintiff's breach-of-contract claims, failure to incorporate the Procedures was not a basis upon which the trial court could grant Defendants judgment, as a matter of law. *See* N.C. Gen. Stat. § 1A-1, Rule 56(c).

### b. Breach of the Procedures

Next, we must discern whether there are any genuine issues of material fact concerning Plaintiff's breach-of-contract claims. *See id.* A breach-of-contract claim requires a material breach, *see Fletcher v. Fletcher*, 123 N.C. App. 744, 752, 474 S.E.2d 802, 807–08 (1996), and whether a breach is material is a question of fact, *see*

*Charlotte Motor Speedway, Inc. v. Tindall Corp.*, 195 N.C. App. 296, 302, 672 S.E.2d 691, 695 (2009).

Here, the Procedures include various protocols concerning notices, hearings, and appeals within Duke's corrective-action process. And concerning Plaintiff's breach-of-contract claims, Plaintiff and Defendants offer competing evidence as to whether Defendants followed the Procedures when they terminated Plaintiff. For example, Plaintiff offered evidence that Defendants denied him an impartial appeals panel, as guaranteed by the Procedures, and Defendants offered evidence that Plaintiff's appeals panel was indeed impartial.

Because we "must view the presented evidence in a light most favorable to the nonmoving party," *see Dalton*, 353 N.C. at 651, 548 S.E.2d at 707, genuine issues of material fact remain in this case—specifically, whether Defendants breached the Procedures and, if so, whether the breaches were material, *see Charlotte Motor Speedway*, 195 N.C. App. at 302, 672 S.E.2d at 695. Therefore, the trial court erred when it granted Defendants the "drastic remedy" of summary judgment concerning Plaintiff's breach-of-contract claims, as Defendants were not entitled to "judgment as a matter of law" because genuine issues of material fact remain. *See Kessing*, 278 N.C. at 534, 180 S.E.2d at 830; N.C. Gen. Stat. § 1A-1, Rule 56(c).

## 2. ADA Claims

Next, Plaintiff challenges the trial court's grant of summary judgment concerning his three ADA claims: one alleging discrimination, one alleging failure to

accommodate, and one alleging retaliation. We disagree with Plaintiff concerning the first two claims, but we agree with him concerning his final claim of retaliation.

The ADA prohibits certain employers from discriminating against disabled employees because of their disabilities. *See* 42 U.S.C. 12112(a). Courts analyze ADA claims under the *McDonnell Douglas* burden-shifting framework. *See Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223 (4th Cir. 2019); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668, 677–78 (1973).

Under *McDonnell Douglas*, a plaintiff must first show a prima-facie ADA claim. *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 58 (4th Cir. 1995). If the plaintiff is successful, the burden shifts to the defendant to show a "legitimate, nondiscriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id*. If the defendant is then successful, "the plaintiff bears the ultimate burden of proving that [the plaintiff] has been the victim of intentional discrimination." *Id.*

### a. Discrimination Claim

A prima-facie discrimination claim under the ADA requires: (1) a disabled plaintiff; (2) who was a "qualified individual"; (3) who suffered an adverse employment action because of a disability. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 572 (4th Cir. 2015). Here, there is no dispute about whether Plaintiff is disabled or whether he suffered an adverse employment action. The parties only dispute whether Plaintiff is a "qualified individual."

A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (quoting 42 U.S.C. § 12111(8)). To establish that he is qualified, Plaintiff must show "(1) that he could satisfy the essential eligibility requirements of the program, i.e., those requirements 'that bear more than a marginal relationship to the [program] at issue, and (2) if not, whether any reasonable accommodation by [Defendants] would enable' [P]laintiff to meet these requirements." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 462 (4th Cir. 2012) (quoting *Tyndall v. Nat'l Educ. Ctrs., Inc.*, 31 F.3d 209, 213 (4th Cir. 1994)) (first alteration in original). In making these determinations, courts give deference to medical schools. *See id.* at 463 (noting that courts are in poor position to assess academic performance). We are in an equally poor position to assess medical practice, so similar deference applies in a medical-residency context. *See id.*

A qualified-individual analysis is a two-part question: (1) Are the employee's obligations "essential"? And (2) can the employee satisfy the obligations, regardless of employer accommodation? *See id.* at 462. We will begin Plaintiff's qualified-individual inquiry by analyzing his contractual obligations, specifically, his obligation to work solely for Duke.

### i. Essential Function

"Under the ADA, '[a]n essential function is a fundamental job duty of the position at issue. The term does not include marginal tasks, but may encompass

- 11 -

individual or idiosyncratic characteristics of the job.'" *Allen v. City of Raleigh*, 140 F. Supp. 3d 470, 482 (E.D.N.C. 2015) (quoting *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 88 (1st Cir. 2012)) (alteration in original). "[C]onsideration shall be given to the employer's judgment as to what functions of the job are essential, and if an employer has prepared a written job description before advertising or interviewing applicants for the job, the description shall be considered evidence of the essential functions of the job." 42 U.S. C. § 12111(8). "[C]ourt[s] give[] a 'significant degree' of deference to an employer's business judgment about the necessities of a job." *Jones*, 696 F.3d at 88 (quoting *Jones v. Walgreen Co.*, 679 F.3d 9, 14 (1st Cir. 2012)).

Here, the Contract states that Plaintiff's stipend from Duke "shall be the Trainee's sole source of compensation. Except for approved and authorized extracurricular activities, the Trainee shall not accept from any other fee of any kind for service." First, Plaintiff argues that this is a limit on Defendant's responsibility to pay, rather than a limit on Plaintiff's ability to work outside of the Program. We disagree.

If Plaintiff's reading was correct, the second sentence would be superfluous; if the stipend language is simply a limit on Duke, there is no need to double down and state that "*Trainee* shall not accept from any other fee of any kind for service." *See United States v. Butler*, 297 U.S. 1, 65, 56 S. Ct. 312, 319, 80 L. Ed. 477, 488 (1936) ("These words cannot be meaningless, else they would not have been used."); *Kungys v. United States*, 485 U.S. 759, 778, 108 S. Ct. 1537, 1550, 99 L. Ed. 2d 839, 857 (1988)

(plurality opinion) (stating that "no provision should be construed to be entirely redundant"). Therefore, the Contract's compensation language limited Plaintiff's ability to work outside of the Program because otherwise, the second sentence would be redundant.

Second, we think adherence to this limitation was an "essential function" of Plaintiff's job. Defendants distilled this limitation to a contractual clause, which tends to show the essential nature of the limitation. *See* 42 U.S.C. § 12111(8). Indeed, if Plaintiff's obligation to work solely for Duke was merely marginal, why include it in the Contract? *See id.* Asked another way, would Defendants have allowed Plaintiff into the Program if Plaintiff's participation was contingent on his ability to simultaneously work elsewhere? That Plaintiff lied to Defendants about driving for Uber and renting his apartment is instructive. Because Plaintiff's work limitation was contractual, *see id.*, and because we give "a 'significant degree' of deference to an employer's business judgment about the necessities of a job," *see Jones*, 696 F.3d at 88, we think Plaintiff's obligation to work solely for Duke was an essential function of participating in the Program.

### ii. Ability to Perform

Under the second prong of the qualified-individual analysis, we must discern "whether any reasonable accommodation by [Defendants] would enable [P]laintiff" to perform his essential functions. *See Halpern*, 669 F.3d at 462. The Fourth Circuit has noted that "[a]n employee may be qualified when hired, but could fail either to

maintain his qualifications or, more commonly, to meet his employer's legitimate expectations for job performance." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 514 (4th Cir. 2006). So in cases where an employee is fired, "the prima facie case requires the employee to demonstrate 'that he was "qualified" in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative." *Id.* at 514–15 (quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1013 (1st Cir. 1979)).

Here, Plaintiff may have initially satisfied the essential function of working solely for Duke while in the Program; because Defendants admitted Plaintiff into the Program, Defendants must have thought so. But that is not the only inquiry. *See id.* at 514. The inquiry is also whether Plaintiff "maintain[ed] his qualifications," i.e., continued to honor his obligation to only work for Duke while in the Program.

The parties offer competing evidence concerning Plaintiff's performance in the Program—but the parties do not dispute that Plaintiff drove for Uber and rented his apartment through AirBnB while working at Duke. Then Plaintiff lied to Defendants about it. And relevant to our analysis, Defendants' reasonable accommodation— easing Plaintiff's workload—would not "enable [P]laintiff to meet" his sole-income commitment. *See Halpern*, 669 F.3d at 462. On the contrary, because Plaintiff's work hours were limited as an accommodation, he potentially had more time to drive for Uber.

Because we defer to medical professionals to determine when a person is

"qualified," *see id.* at 463, we agree with Defendants concerning Plaintiff's ability, "with or without reasonable accommodation, [to] perform the essential functions of the employment position," *see Wilson*, 717 F.3d at 345. Put differently: Plaintiff did not perform the essential function of working solely for Duke while in the Program, and Defendants' accommodation had no bearing and Plaintiff's ability to do so. *See id.* at 345.

Therefore, Plaintiff cannot establish an element a prima-facie discrimination claim because he is not a "qualified individual." *See Jacobs*, 780 F.3d at 572. As Plaintiff cannot establish an element of prima-facie discrimination claim, the trial court did not err by granting Defendants summary judgment because Defendants were "entitled to a judgment as a matter of law." *See* N.C. Gen. Stat. § 1A-1, Rule 56(c); *Jacobs*, 780 F.3d at 572.

### b. Failure to Accommodate Claim

To establish a prima-facie failure-to-accommodate claim under the ADA, Plaintiff must show: "(1) that he was an individual who had a disability within the meaning of the statute; (2) that [Defendants] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that [Defendants] refused to make such accommodations." *Wilson*, 717 F.3d at 345 (quoting *Rhoads v. Fed. Deposit Ins. Corp.,* 257 F.3d 373, 387 n.11 (4th Cir. 2001)).

The ADA does not provide an all-inclusive definition of the term "reasonable

accommodation." Rather, it gives examples of what a "'reasonable accommodation' may include," like "job restructuring, part-time or modified work schedules, reassignment to a vacant position . . . and other similar accommodations." 42 U.S.C. § 12111(9)(B). "[T]he range of reasonable accommodations is broad . . . ." *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1011 (4th Cir. 2020).

The Fourth Circuit has explained that "what counts as a reasonable accommodation is not an *a priori* matter but one that is sensitive to the particular circumstances of the case." *Id.* "[W]hat will serve as a reasonable accommodation in a particular situation may not have a single solution, but rather, many possible solutions." *Id.* As long as the employer's chosen accommodation is reasonable, "not even a well-intentioned court may substitute its own judgment for the employer's choice." *Id.* at 1012.

Here, Defendants granted Plaintiff's accommodation request before terminating his employment. Specifically, Defendants committed to Plaintiff that he would not be "scheduled for more than 5 days in a row." Plaintiff does not allege that Defendants failed to meet their assurance, and "modified work schedules" are one of the codified examples of a reasonable accommodation. *See* 42 U.S.C. § 12111(9)(B).

Plaintiff does not argue that Defendants' accommodation was unreasonable. Rather, Plaintiff argues that Defendants' accommodation "was inconsequential . . . because [they] intended to fire" him. Indeed, Plaintiff argues that Defendants "never implemented the accommodations because they intended to terminate plaintiff

instead."

But if we accept Plaintiff's argument, every employer who fires a qualified individual after granting an accommodation is subject to a failure-to-accommodate suit if the employee claims the employer ultimately intended to fire him. This cannot be so. *See Wilson*, 717 F.3d at 345 (stating that the fourth element of a failure-to-accommodate claim requires a *refusal* to make the accommodation). In our view, Plaintiff's argument may support a retaliation claim, but not failure to accommodate. *See id*. Concerning Plaintiff's failure-to-accommodate claim, the facts are clear: Defendants granted Plaintiff's accommodation request by promising not to schedule him to work more than five consecutive days. Plaintiff does not allege that Defendants broke this promise.

Accordingly, there is "no genuine issue" concerning the last element of Plaintiff's failure-to-accommodate claim. *See id.*; N.C. Gen. Stat. § 1A-1, Rule 56(c). Therefore, the trial court appropriately granted Defendants summary judgment concerning Plaintiff's failure-to-accommodate claim because Defendants were "entitled to a judgment as a matter of law." *See* N.C. Gen. Stat. § 1A-1, Rule 56(c).

### c. **Retaliation Claim**

To establish a prima-facie retaliation claim under the ADA, Plaintiff must show: "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012) (citing *A Soc'y Without a*

*Name v. Virginia,* 655 F.3d 342, 350 (4th Cir. 2011)). Here, there is no dispute about whether Plaintiff engaged in protected conduct by seeking accommodations or whether he suffered an adverse employment action when Defendants terminated him from the Program. The parties only dispute whether there is a genuine issue concerning a "causal link" between the two.

"A temporal connection between the protected conduct and the adverse employment action may be sufficient to present a genuine factual issue on retaliation." *Lamb v. Qualex, Inc.*, 33 F. App'x 49, 60 (4th Cir. 2002) (citing *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999)). "Indeed, '[a] close temporal connection between the two events is generally enough to satisfy the third element of the prima facie test.'" *Id.* (quoting *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 796–97 (7th Cir. 1997)).

Here, on 1 March 2017, Plaintiff completed Duke's Reasonable Accommodation Request Form concerning his depression. On 30 March 2017, Defendants terminated Plaintiff's employment because of "institutional policy violations." In other words, there was less than one month between "the protected conduct and the adverse employment action," which is usually "sufficient to present a genuine factual issue on retaliation." *See id.* Because we "must view the presented evidence in a light most favorable to the nonmoving party," *see Dalton*, 353 N.C. at 651, 548 S.E.2d at 707, we believe the "causal link" element of Plaintiff's prima-facie case is satisfied, *see Reynolds*, 701 F.3d at 154.

Therefore, the burden shifts to Defendants to show a "legitimate, nondiscriminatory explanation which, if believed by the *trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *See Ennis,* 53 F.3d at 58 (emphasis added).  Accordingly, a question of material fact remains, and the trial court erred by granting Defendants summary judgment concerning Plaintiff's retaliation claim.  *See* N.C. Gen. Stat. § 1A-1, Rule 56(c).

**B. Attorneys' Fees**

In his final argument, Plaintiff asserts that the trial court erred by denying Plaintiff's request for attorneys' fees concerning his successful motion to compel.  We disagree.

We review a trial court's decision to award or deny attorneys' fees under Rule 37 for abuse of discretion.  *Graham v. Rogers*, 121 N.C. App. 460, 465, 466 S.E.2d 290, 294 (1996).  "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."  *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988).

Normally when a motion to compel is granted under Rule 37, the trial court should award attorneys' fees to the moving party.  N.C. Gen. Stat. § 1A-1, Rule 37(a)(4) (2023).  But a trial court need not award attorneys' fees if "the court finds that the opposition to the motion was substantially justified or that other circumstances make an award of expenses unjust."  *Id*.

Here, there is nothing in the record to suggest that the trial court acted

arbitrarily by denying Plaintiff's request for attorneys' fees concerning his successful motion to compel. The trial court "considered arguments of counsel" and conducted an in-depth, in-camera review of the documents for which Defendants claimed privilege, and the trial court decided, in its discretion, not to award attorneys' fees to Plaintiff. The trial court's decision was not "manifestly unsupported by reason," and therefore, the trial court did not abuse its discretion. *See Hennis*, 323 N.C. at 285, 372 S.E.2d at 527.

## V.    Conclusion

We conclude that the trial court erred in granting Defendants summary judgment concerning Plaintiff's breach-of-contract and ADA retaliation claims, but the trial court did not err concerning the remainder of the summary-judgment order. And the trial court did not err by declining to award Plaintiff attorneys' fees concerning his motion to compel. Accordingly, we reverse the trial court's order in part, affirm in part, and remand.

AFFIRMED in part, REVERSED in part, and REMANDED.

Judges COLLINS and WOOD concur.